**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RICHARD L. McCLOSKEY and
FLORENCE B. McCLOSKEY,

               Plaintiffs,                      Case No. 05-70279

v.                                           Hon. Gerald E. Rosen

PARAMJIT S. KLAIR, BHUPINDER
SINGH, and BUFFALO GROUP, INC.,

               Defendants.
_____/

**OPINION AND ORDER REGARDING**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____

             PRESENT:   Honorable Gerald E. Rosen
                            United States District Judge

## I.  INTRODUCTION

Plaintiffs Richard L. and Florence B. McCloskey commenced this suit in state

court in December of 2004, asserting state-law negligence and loss of consortium claims

against Defendants Paramjit S. Klair and Buffalo Group, Inc. arising out of an October 9,

2003 collision between a car driven by Mr. McCloskey and a tractor-trailer truck driven

by Defendant Klair.[1]  Defendants removed the case to this Court on January 26, 2005,

_____

[1]Because Mrs. McCloskey's loss of consortium claims are entirely derivative of the
negligence claims asserted by her husband, the Court will refer to Mr. McCloskey as the sole

citing diversity of citizenship between the Michigan plaintiffs and the Canadian defendants. <u>See</u> 28 U.S.C. § 1332(a). Following removal, Plaintiff filed an amended complaint naming an additional individual, Bhupinder Singh, as a defendant, under the theory that Defendant Singh is the owner of the truck that struck Plaintiff's vehicle.

Through the two motions now pending before the Court, Defendants seek summary judgment in their favor on Plaintiff's state-law negligence claims. In support of the first of these motions, Defendants argue that Plaintiff has failed to establish that he suffered a "serious impairment of body function" as necessary to sustain a claim under Michigan's no-fault statutory scheme governing tort liability for motor vehicle accidents. <u>See</u> Mich. Comp. Laws § 500.3135(1). In the second of the two pending motions, Defendant Singh contends that he does not meet the Michigan statutory definition of a vehicle "owner," <u>see</u> Mich. Comp. Laws §§ 257.401(2), 257.401a, because he had leased the truck at issue to Defendant Buffalo Group.

These motions have been fully briefed by the parties. Having reviewed the parties' written submissions and accompanying exhibits, as well as the record as a whole, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in the written record, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendants' motions "on the briefs." <u>See</u> Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. This opinion and

---

"Plaintiff" throughout the balance of this opinion.

order sets forth the Court's rulings on these motions.

## II.  <u>FACTUAL BACKGROUND</u>

On October 9, 2003 at approximately 5:40 a.m., Plaintiff Richard McCloskey was on his way to work, traveling northbound on I-75 in Monroe County, Michigan in a 1994 Geo Metro.  As Plaintiff drove into a construction zone, he slowed his vehicle to around 10 or 15 miles per hour.  Unfortunately, the tractor-trailer truck behind him, driven by Defendant Paramjit Klair, did not slow down sufficiently upon entering the construction zone.  Instead, Klair's truck slammed into the rear end of Plaintiff's car, pushing it forward so that it was pinned between Klair's vehicle and another tractor-trailer truck that was traveling in front of Plaintiff's car in the construction zone.[2]

Needless to say, Plaintiff's vehicle sustained severe damage to both its front and rear ends as a result of this accident.  Plaintiff also suffered significant injuries, losing consciousness and requiring the assistance of a local fire department to extricate him from what remained of his car.  Plaintiff was airlifted to the Medical College Hospitals in Toledo, Ohio, where he remained under care and observation for several days.  The hospital records from this initial period indicate that Plaintiff suffered "extensive bony traumatic injury including left clavicular fracture and bilateral multiple rib fractures," as well as a collapsed lung and a left scapular fracture.  (<u>See</u> Plaintiff's Response, Ex. 3,

---

[2]As discussed below, Defendant Bhupinder Singh was a passenger in the truck at the time of the accident, and Singh had leased the truck to Defendant Buffalo Group, Inc. under an "Owner Operator Agreement" dated December 10, 2001.

3

Hospital Records.)

After Plaintiff was discharged from the hospital on October 13, 2003, he required his wife's assistance for the next several weeks to perform such basic tasks as going to the bathroom, sitting up and lying down, walking, and taking a shower.  He initially slept on a couch, but his wife brought in a hospital bed for about two weeks so that he could more easily get up and lie back down.  Plaintiff then slept on a downstairs couch for a few more weeks until late November of 2003, when he regained sufficient strength to climb the stairs and return to his own bed.

On December 4, 2003, Plaintiff began a course of physical therapy at Mercy Memorial Hospital in Monroe.  The stated goals of this therapy were to improve the range of motion in Plaintiff's left shoulder to within functional limits, to improve the strength in this shoulder, and to improve Plaintiff's ability to perform such activities as lifting, pushing, pulling, and overhead activities.  After 18 treatments spanning until January 26, 2004, Plaintiff's therapist reported only partial progress toward these goals, stating that Plaintiff had achieved range of motion within functional limits but that the pain in his shoulder persisted and his strength remained the same as when he began his therapy.  In accordance with his therapist's recommendation, Plaintiff has continued to perform rehabilitation exercises at home.

Plaintiff returned to his work as a machinist in early January of 2004, with a 25-pound lifting restriction imposed by his family physician.  Over the next several months, he occasionally left work early when the pain in his shoulder became "unbearable."

4

(Plaintiff's Dep. at 34.)  In addition, Plaintiff testified at his deposition that he remains unable to perform activities that require him to raise his left arm over his head, such as reaching up to remove items from a closet shelf.  He further testified that his wife helps him more with household chores and yard work than she did before the accident, and that he has done less boating and fishing because of the time and effort he has instead had to devote to exercise and rehabilitation.

The most recent medical records provided to the Court date from May and June of 2004, when Plaintiff consulted with Dr. Sean Adleman of Orthopedic Surgery Associates in Ypsilanti, Michigan.  Dr. Adleman reported that Plaintiff "has returned to much of his normal function but he has had some persistent left shoulder pain and weakness." (Plaintiff's Response, Ex. 9.)  Dr. Adleman diagnosed Plaintiff as suffering from "a left floating shoulder type injury" with "some shoulder dyskinesias/dysfunction essentially because of his shortened shoulder girdle," and he opined that Plaintiff "clearly is going to have some deficits as this was clearly a massive injury."  (Id.)  Dr. Adleman further observed that "because of his injury, [Plaintiff] clearly is at some increased risk for long-term disability and arthrosis."  (Id.)

5

## III. <u>ANALYSIS</u>

**A.     The Standards Governing Defendants' Motions**

Through the present motions, Defendants seek summary judgment in their favor on Plaintiff's state-law negligence claims.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

As discussed below, the issues raised in Defendants' motions are amenable to resolution as a matter of law, at least so long as the record is viewed in a light most favorable to Plaintiff.  Accordingly, the Court turns to the controlling questions of law presented in Defendants' motions.

**B.     Plaintiff Has Suffered a "Serious Impairment of Body Function" as Defined Under Michigan No-Fault Law.**

As noted, two motions presently are pending before the Court.  In the first, Defendants argue that Plaintiff has failed to meet one of the prerequisites to a tort recovery under Michigan's no-fault statutory scheme governing motor vehicle accidents. In particular, Michigan law limits "tort liability for noneconomic loss caused by [the] ownership, maintenance, or use of a motor vehicle" only to those cases in which "the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." Mich. Comp. Laws § 500.3135(1).  The parties agree that the

6

second category, "serious impairment of body function," governs Plaintiff's claims in this case, but they disagree as to whether the injuries suffered by Plaintiff in the October 9, 2003 car-truck collision satisfy this standard. As discussed below, the Court finds that they do.

As recently explained by the Michigan Supreme Court, Michigan's no-fault statute "abolished tort liability generally in motor vehicle accident cases and replaced it with a regime that established that a person injured in such an accident is entitled to certain economic compensation from his own insurance company regardless of fault." Kreiner v. Fischer, 471 Mich. 109, 683 N.W.2d 611, 616 (2004). "In exchange for the payment of these no-fault economic loss benefits from one's own insurance company," the Michigan legislature "significantly limited the injured person's ability to sue a third party for noneconomic damages, e.g., pain and suffering." Kreiner, 683 N.W.2d at 616. In particular, no such tort recovery may be obtained "unless the injured person 'has suffered death, serious impairment of body function, or permanent serious disfigurement.'" 683 N.W.2d at 616 (quoting Mich. Comp. Laws § 500.5135(1)) (footnote omitted).

Under this statutory scheme, the "issue[] of whether an injured person has suffered serious impairment of body function" is a "question[] of law for the court," so long as "[t]here is no factual dispute concerning the nature and extent of the person's injuries" or any such factual dispute "is not material to the determination as to whether the person has suffered a serious impairment of body function." Mich. Comp. Laws § 500.5135(2)(a). In addition, the statute expressly defines a "serious impairment of body function" as "an

7

objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life."  Mich. Comp. Laws § 500.3135(7).

The Supreme Court's decision in <u>Kreiner</u>, as well as several subsequent Michigan Court of Appeals and federal district court rulings, provide considerable guidance in determining whether Plaintiff's injuries in this case constitute a "serious impairment of body function" under Michigan's no-fault statute.  Upon reviewing the pertinent statutory language, the Court in <u>Kreiner</u> explained:

> The starting point in analyzing whether an impairment affects a person's "general" i.e., overall, ability to lead his normal life should be identifying how his life has been affected, by how much, and for how long.  Specific activities should be examined with an understanding that not all activities have the same significance in a person's overall life.  Also, minor changes in how a person performs a specific activity may not change the fact that the person may still "generally" be able to perform that activity.

> \* \* \* \*

> The following nonexhaustive list of objective factors may be of assistance in evaluating whether the plaintiff's "general ability" to conduct the course of his normal life has been affected:  (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery.  This list of factors is not meant to be exclusive nor are any of the individual factors meant to be dispositive by themselves.  For example, that the duration of the impairment is short does not necessarily preclude a finding of a "serious impairment of body function."  On the other hand, that the duration of the impairment is long does not necessarily mandate a finding of a "serious impairment of body function."  Instead, in order to determine whether one has suffered a "serious impairment of body function," the totality of the circumstances must be considered, and the ultimate question that must be answered is whether the impairment "affects the person's general ability to conduct the course of his or her normal life."

8

Kreiner, 683 N.W.2d at 625-26 (footnotes omitted).

The Court then applied this analysis to the facts of the two cases before it.  In the first, plaintiff Daniel Straub had injured three fingers on his nondominant hand when his motorcycle collided with an automobile, suffering a broken bone in his little finger and injured tendons in two other fingers.  He underwent outpatient surgery four days after the accident to repair the tendons and wore a cast for about a month to assist the healing process, but he received no medical treatment for the broken bone.  Straub took prescription pain medication for about two weeks following the accident, and attended two sessions of physical therapy.  Straub's doctor authorized him to return to work on a part-time basis six weeks after the accident, and he did so two weeks later.  He returned to full-time work roughly three months after the accident, and resumed his weekend work of performing in a band about a month later.  Straub testified at his deposition that he had regained his ability to perform all of the job duties and activities in which he had engaged prior to his injury, albeit sometimes with discomfort, but that he remained unable to completely straighten his middle finger and to completely close his hand.

Under these facts, the Court found that Straub had not suffered a serious impairment of body function:

> [Straub's] treatment was not significant or long-term.  Within two months, the fracture and surgical wounds had healed.  There were two sessions of physical therapy.  At that point, Straub discontinued all medical treatment. Plaintiff estimated he was ninety-nine percent back to normal by mid-January 2000.  Given that Straub's injury was not extensive, recuperation was short, unremarkable, and virtually complete, and the effect of the injury on body function was not pervasive, we conclude that Straub's general

9

ability to live his normal life was not affected.  There is no medical
evidence that Straub has any residual impairment or that the course of
Straub's life has been affected.  The temporary limitations Straub
experienced do not satisfy the statutory prerequisites.  Considered against
the backdrop of his preimpairment life and the limited nature and extent of
his injuries, we conclude that Straub's postimpairment life is not so
different that his "general ability" to lead his normal life has been affected.
Because the course of Straub's normal life has not been affected, he failed
to satisfy the "serious impairment of body function" threshold for recovery
of noneconomic damages.

Kreiner, 683 N.W.2d at 627.

In the second case before the Court, plaintiff Richard Kreiner was injured in an

automobile accident, and then visited his family physician four days later with complaints

of pain in his lower back, hip, and leg.  The doctor administered a cortisone injection, and

then gave a second injection and prescribed physical therapy and pain medication when

Kreiner returned a few days later and complained that the pain was persisting.  Six weeks

later, when Kreiner continued to complain of pain, he was referred to a neurologist who

diagnosed him as suffering mild nerve irritation to the right fourth lumbar nerve root in

his back and degenerative disc disease with spondylolisthesis.  The neurologist prescribed

Motrin along with a muscle relaxant, and instructed Kreiner to perform exercises at home.

Kreiner made four follow-up visits to the neurologist over the next year and a half, with

Kreiner continuing to complain of radiating pain and the doctor prescribing pain

medication, a continued program of home exercise, and a three-week course of physical

therapy.  Throughout this period, Kreiner continued to work as a self-employed carpenter

and construction worker, although he limited himself to a six-hour workday, was unable

10

to do roofing work or to stand on a ladder for a prolonged period, could not lift over eighty pounds, and could no longer walk more than a half-mile without resting.

Again, the Court found that Kreiner had not demonstrated a serious impairment of body function. The Court observed that Kreiner's "life after the accident was not significantly different than it was before the accident," as he continued to perform most of the same job tasks and "[h]is injuries did not cause him to miss one day of work." 683 N.W.2d at 628. The Court then reasoned:

> Looking at Kreiner's life as a whole, before and after the accident, and the nature and extent of his injuries, we conclude that his impairment did not affect his overall ability to conduct the course of his normal life. While he cannot work to full capacity, he is generally able to lead his normal life. A negative effect on a particular aspect of an injured person's life is not sufficient in itself to meet the tort threshold, as long as the injured person is still generally able to lead his normal life. Considered against the backdrop of his preimpairment life, Kreiner's postimpairment life is not so different that his "general ability" to conduct the course of his normal life has been affected.

Kreiner, 683 N.W.2d at 628 (footnotes omitted).

In contrast to these determinations in Kreiner, the Michigan Court of Appeals has found that the plaintiffs in several subsequent cases have succeeded in demonstrating a serious impairment of body function. In McDanield v. Hemker, 268 Mich. App. 269, 707 N.W.2d 211 (2005), for example, plaintiff Mable McDanield suffered head, neck, back, and shoulder injuries when a pickup truck failed to stop at an intersection and collided with her van. McDanield's doctor ordered her to remain off work as a school bus driver and food service worker for six weeks, and her doctor again restricted her from working

11

for several months when she began to experience increased neck and arm pain approximately three months after the accident. Repeated medical examinations and treatments over the next two years or more revealed that McDanield had suffered permanent and progressive damage to ligaments in her neck and injuries to her cervical spine, and one of her doctors opined that she would experience "a life of pain and discomfort and will need to adapt accordingly." McDanield, 707 N.W.2d at 219.

Under these circumstances, the Court of Appeals found that McDanield had suffered a serious impairment of body function, where "[c]omparing McDanield's life before and after the accident is similar to comparing day to night; all aspects of her life have been significantly affected with no meaningful relief in sight." 707 N.W.2d at 219. Applying the five factors enumerated in Kreiner, the court found that each of these considerations favored a finding of an effect upon McDanield's general ability to lead her normal life, where (i) the pain and restrictions experienced by McDanield "come into play in almost any activity or movement," (ii) her medical treatment was "extensive," "ongoing and will continue into the foreseeable future," (iii) her impairment was "in all likelihood . . . permanent," with a "poor" prognosis for any eventual improvement, and (iv) her doctor had imposed restrictions and prescribed treatments that corroborated the residual pain she was suffering as a result of her injuries. 707 N.W.2d at 219-21.

The Court of Appeals also determined in Williams v. Medukas, 266 Mich. App. 505, 702 N.W.2d 667 (2005), that the plaintiff in that case, Edwin Williams, had suffered a serious impairment of body function. Williams sustained a fractured right shoulder and

12

left hand in an automobile accident, and the ensuing treatment left both of his arms

immobilized for a month following the accident.  About three months after the accident,

Williams returned without restrictions to his work as a salesman, and resumed coaching a

middle school basketball team.  In holding that Williams's injuries had affected his

general ability to lead his normal life, the court reasoned:

> Here, Williams' injuries were objectively manifested by x-rays.  His arms were rendered virtually useless for one month following his accident, and he was unable to feed himself or otherwise attend to his basic needs. Some three months after the accident, Williams returned to work and to his position as a coach for a middle school girls basketball team.  Although Williams was able to return to these positions, he could no longer engage in activities that required him to lift his right arm above his head.  Because of this, he could not demonstrate to his students how to shoot [a] basketball. In addition, Williams testified at his deposition that before the accident he had played golf two or three times a week.  After the accident, Williams could no longer play golf or engage in activities with his grandchildren, such as playing catch.  Although no evidence showed that Williams' physician restricted him from engaging in various recreational activities, and although self-imposed restrictions will not establish a residual impairment, Williams' physician did indicate that Williams lacked full range of motion in his left wrist and that his right shoulder was healing in such a way that its range of motion would be permanently limited.  While these limitations might not rise to the level of a serious impairment of body function for some people, in a person who regularly participates in sporting activities that require a full range of motion, these impairments may rise to the level of a serious impairment of a body function.  Given Williams' participation in teaching basketball and his love of golf, which he can no longer pursue, we must conclude that the limitations imposed by Williams' injuries affect his general ability to lead his normal life.

Williams, 702 N.W.2d at 670-71 (citations omitted).

This Court also views the recent federal district court decision in McMullen v.

Duddles, 405 F. Supp.2d 826 (W.D. Mich. 2005), as instructive here.  In that case, a car

13

driven by plaintiff Lisa McMullen was rear-ended by a pickup truck at an intersection, and McMullen was taken to a hospital and diagnosed with a herniated disc.  She pursued a variety of forms of treatment over the following years, including physical therapy, injections, pain medication, and muscle relaxants, but she continued to experience significant pain and was considered a candidate for disc replacement or spinal fusion surgery.  Throughout all this time, however, "[n]o physician ha[d] placed any restrictions or limitations upon McMullen's employment or other activities," albeit in part because McMullen "work[ed] for her parents and they ma[d]e any necessary accommodations." McMullen, 405 F. Supp.2d at 829.

The court found that the case before it was similar to McDanield, supra, and thus warranted the same outcome.  First, the court noted the evidence that McMullen had difficulty finding and keeping a job that she was capable of performing, and that she had been successful in working for her parents only because they were able to accommodate her occasional need for a significantly reduced work schedule.  In addition, the record revealed that as a result of McMullen's injury, she was "unable to engage in many of the recreational activities that she formerly enjoyed," she "walk[ed] differently because she is stiff," and she could not "stand for more than ten or fifteen minutes at a time." McMullen, 405 F. Supp.2d at 838.  The court further observed that McMullen had "received various forms of treatment that have provided little or no relief," that she was "still being treated for pain by doctors on a regular basis," and that "except for the possibility of major back surgery, there is no relief in sight and the duration of the

14

impairment has been and will be long term." 405 F. Supp.2d at 838. Finally, the court rejected the defendant's assertion that McMullen's limitations were all self-imposed, where her doctors continued to prescribe pain medication and physical therapy, and where these physicians had recognized that she might not be able to tolerate certain activities and had advised her to avoid such activities.

Against this backdrop, the Court returns to the present case. As a threshold matter, it is clear, and the parties evidently agree, that the question whether Plaintiff has suffered a "serious impairment of body function" is amenable to resolution by the Court as a matter of law. Under Michigan's no-fault statute, this matter presents a "question[] of law for the court" so long as "[t]here is no factual dispute concerning the nature and extent of [the plaintiff's] injuries." Mich. Comp. Laws § 500.3135(2)(a). In their present motion, at least, Defendants do not dispute the nature and extent of Plaintiff's injuries as reflected in his deposition testimony and medical records. Rather, Defendants maintain only that this evidence does not establish a "serious impairment of body function" within the meaning of the Michigan statute and the relevant case law. This plainly is a question of law for the Court to decide, as the Michigan statute itself confirms.

Next, the Court readily concludes, and Defendants again do not appear to dispute, that Plaintiff has produced the requisite proof of "an objectively manifested impairment of an important body function." Mich. Comp. Laws § 500.3135(7). As the Michigan Supreme Court explained, this statutory prerequisite is meant to exclude "impairment[s] . . . of an unimportant body function," as well as minor injuries that do not rise to the level

15

of an "impair[ment]." Kreiner, 683 N.W.2d at 625. The Court further emphasized that "[s]ubjective complaints that are not medically documented are insufficient." 683 N.W.2d at 625. The record here easily satisfies these threshold conditions. In the immediate aftermath of the October 9, 2003 accident in this case, Plaintiff was hospitalized for several days with extensive injuries, including a fractured clavicle and scapula and multiple broken ribs, and he required his wife's assistance for the next several weeks to perform such basic tasks as going to the bathroom, sitting up and lying down, walking, and taking a shower. This provides ample, medically documented support for the conclusion that Plaintiff's injuries impaired important body functions such as basic mobility. Indeed, the Michigan Supreme Court reached the same conclusion as to both plaintiffs in Kreiner, even though neither was hospitalized or immobilized in the aftermath of his injuries.

This leaves only the question whether Plaintiff's impairments "affect[ed] [his] general ability to lead his . . . normal life." Mich. Comp. Laws § 500.3135(7). There is no doubt that, for several weeks after his car was crushed by Defendants' tractor-trailer, Plaintiff was utterly unable to lead anything like his "normal life." He was hospitalized for several days, was unable to care for himself for more than a month after his discharge from the hospital, had to sleep on a downstairs couch or in a rented hospital bed for several weeks, and could not return to work for approximately 12 weeks after the accident. This major disruption to several aspects of Plaintiff's life throughout the last three months of 2003 alone might well suffice to establish the requisite effect upon

16

Plaintiff's general ability to lead his normal life.  As the Michigan Supreme Court explained in <u>Kreiner</u>, "that the duration of the impairment is short does not necessarily preclude a finding of a 'serious impairment of body function,'" so long as the impairment otherwise is of a nature and extent that it affects "the plaintiff's 'general ability' to conduct the course of his normal life."  <u>Kreiner</u>, 683 N.W.2d at 626.  With the possible exception of <u>Williams</u>, <u>supra</u>, in which both of the plaintiff's arms were immobilized for a month following his accident, none of the above-cited cases featured the extensive, multiple, and initially incapacitating injuries suffered by Plaintiff here.

An analysis of the five factors listed in <u>Kreiner</u>, 683 N.W.2d at 626, lends further support to the view that Plaintiff's impairments affected his general ability to lead his normal life.  As discussed, there is no question that "the nature and extent of the impairment[s]" in this case are indicative of an impact upon Plaintiff's general ability to pursue his normal life.  The accident resulted in clavicle, shoulder, and rib fractures, as well as a collapsed lung, injuries that are readily characterized as severe.  Next, regarding the "type and length of treatment required," Plaintiff's significant injuries necessitated several days of hospital care and a lengthy period of rehabilitation before he could resume caring for himself and return to work.  Even if Plaintiff's treatments were viewed as coming to an end after he completed his 18-visit course of physical therapy in late January of 2004, this still would constitute nearly four months of medical treatment devoted to restoring Plaintiff's mobility and capacity to work.  The Court finds, then, that the first two factors cited in <u>Kreiner</u> point decisively toward the conclusion that Plaintiff

17

suffered a serious impairment of body function.

The remaining three factors are somewhat more equivocal, however.  Kreiner suggests that a court consider the "duration of the impairment," the "extent of any residual impairment," and the "prognosis for eventual recovery."  Kreiner, 683 N.W.2d at 626.  In this case, while Plaintiff has continued to perform the rehabilitation exercises recommended by his physical therapist, and while he has received follow-up care from an orthopedist, it is fair to say that the bulk of the medical care received by Plaintiff was concentrated in the three- or four-month period following the October 9, 2003 accident. Since January of 2004, Plaintiff's condition has evidently been fairly stable — he was able to return to work, albeit with the occasional need to leave early due to shoulder pain, and he has been able to resume most of his usual recreational activities and chores around the home, albeit with some pain, with more assistance from his wife, and without the ability to perform tasks that require him to raise his left arm over his head.

As recognized in McDanield and McMullen, supra, Plaintiff's ability to adapt to his limitations and resume most of his pre-accident activities does not, in itself, preclude a finding that he has suffered impairments that have affected his general ability to lead his normal life.  Plaintiff continues to experience pain and weakness in his left shoulder, and the medical evidence indicates that these limitations are permanent.  On the other hand, the record suggests that Plaintiff's most significant impairments were of moderate duration, perhaps three or four months.  After this point, Plaintiff has experienced only relatively modest residual impairments, primarily pain and restricted use and range of

18

motion of his left shoulder, and he has enjoyed a recovery that, while not one hundred percent complete, has left him able to perform most of his pre-accident activities.

Nonetheless, the Court finds, under the facts of this case, that these longer-term considerations do not outweigh the considerable evidence of Plaintiff's severe, incapacitating impairments during a several-month period following the October 9, 2003 accident. If, as the Michigan Supreme Court has recognized, an impairment need not be long-lasting to affect one's general ability to lead his or her normal life, then severe injuries of the sort suffered by Plaintiff here surely should qualify under this standard. To be sure, Plaintiff has been able to return to a near-normal life, seemingly as a result of his diligent efforts and persistence in adhering to the rehabilitative measures recommended by his physicians.[3] Yet, the Michigan no-fault statute does not require a ***permanent*** impact upon a person's general ability to lead his or her normal life — to the contrary, there is no temporal limitation or reference whatsoever in the statute's definition of a

---

[3]In his response to Defendants' motion, Plaintiff complains that Defendants' reading of the Michigan no-fault statute would effectively penalize him for pursuing a rigorous and largely successful course of rehabilitation. Yet, whatever one might think about this as a matter of public policy, the wording of the statute itself seemingly imposes such a "penalty," through its explicit incorporation of the subjective inquiry whether a plaintiff is generally able "to lead his or her normal life." Mich. Comp. Laws § 500.3135(7); see also Kreiner, 668 N.W.2d at 626 & n.19 (recognizing that the statutory inquiry includes a subjective element).

A plaintiff's success in rehabilitation will inevitably bear upon this subjective inquiry. While a defendant presumably could demonstrate that a plaintiff's failure to return to a normal life was attributable to his or her own self-imposed limitations or lack of effort, it is undoubtedly easier for a defendant to establish a restored ability to lead a normal life where, as here, the plaintiff has actually been able to return to a near-normal life as a result of his rigorous pursuit of treatment and rehabilitation.

"serious impairment of body function."  As the Michigan Supreme Court observed in Kreiner, this supports the conclusion that even a short-term impairment might meet this statutory definition under the proper circumstances.  Such is the case here, where Plaintiff's severe injuries wholly disrupted his life for several months.  Accordingly, the Court rejects Defendants' contention that Plaintiff has failed to establish the statutory prerequisite of a "serious impairment of body function."

**C.   Defendant Singh's Status as Lessor of the Truck that Struck Plaintiff's Vehicle Does Not Shield Him from Liability as the Owner of the Truck.**

In his separate motion, Defendant Singh argues that Michigan law shields him from liability in this case by virtue of an "Owner Operator Agreement" under which he leased to Defendant Buffalo Group the tractor-trailer that struck Plaintiff's vehicle.  In particular, while a Michigan statute subjects ***owners*** of motor vehicles to civil liability for injuries caused by the negligent operation of their vehicles, whether by themselves or by an agent, see Mich. Comp. Laws § 257.401(1), this same statute shields ***lessors*** from liability for injuries resulting from the operation of the leased vehicle, provided that certain conditions are met, see Mich. Comp. Laws § 257.401(2).  Although Defendant Singh continued to operate the tractor-trailer in question despite his lease arrangement with Buffalo Group — and, indeed, he was actually in the vehicle when it collided with Plaintiff's car — he nonetheless contends that he is properly viewed as a lessor rather than an owner under this statute.  The Court cannot agree.

Defendant Singh acknowledges in his motion that he owns the tractor-trailer that

20

struck Plaintiff's car.  Nonetheless, he asserts that he is shielded from liability for

Plaintiff's injuries under the following provision in Michigan's owner liability statute:

> A person engaged in the business of leasing motor vehicles who is
> the lessor of a motor vehicle under a lease providing for the use of the
> motor vehicle by the lessee for a period that is greater than 30 days . . . is
> not liable at common law for damages for injuries to either person or
> property resulting from the operation of the leased motor vehicle, including
> damages occurring after the expiration of the lease if the vehicle is in the
> possession of the lessee.

Mich. Comp. Laws § 257.401(2).[4]  Singh argues that a "Owner Operator Agreement" he

entered into with Defendant Buffalo Group on December 10, 2001 serves as the requisite

lease under this statute, as it granted "exclusive control and use" of the truck to Buffalo

Group throughout the term of the parties' agreement.  (See Defendant Singh's Motion,

Ex. A, Owner Operator Agreement at ¶ 3.)[5]

   Yet, while the Court is quite prepared to assume that the Owner Operator

_____

   [4]Another Michigan statute similarly (and somewhat redundantly) provides:

> As used in this chapter, "owner" does not include a person engaged in the
> business of leasing motor vehicles who is the lessor of a motor vehicle pursuant to
> a lease providing for the use of the motor vehicle by the lessee for a period that is
> greater than 30 days.

Mich. Comp. Laws § 257.401a.

   [5]This sort of owner/operator agreement evidently is common in the trucking industry,
where only carriers that have been authorized by the Interstate Commerce Commission ("ICC")
may engage in interstate trucking.  Accordingly, truck owners such as Defendant Singh lease
their vehicles to ICC-authorized carriers, such as Defendant Buffalo Group, and the carrier, in
turn, retains the owner to operate the truck in furtherance of the carrier's trucking operations.
The Department of Transportation has promulgated regulations that govern this sort of leasing
arrangement, see 49 C.F.R. §§ 376.11, 376.12, and it appears that the Owner Operator
Agreement entered into between Singh and Buffalo Group was drafted against the backdrop of
these regulations.

21

Agreement is a "lease" within the meaning of the Michigan statute, this still leaves the question whether Defendant Singh is a "person engaged in the business of leasing motor vehicles," Mich. Comp. Laws § 257.401(2), as necessary to shield him from liability as a "lessor" rather than an "owner."  Singh's initial motion and accompanying brief are utterly silent on this question.  When confronted by Plaintiff's argument in his response that Singh is ***not***, in fact, "engaged in the business of leasing motor vehicles," but instead has merely leased a ***single*** vehicle — namely, the tractor-trailer at issue here — Singh cites the Michigan Court of Appeals decision in <u>Black v. Joe Panian Chevrolet, Inc.</u>, 239 Mich. App. 227, 608 N.W.2d 89 (2000), as purportedly having adopted a broad construction of being "engaged in the business of leasing motor vehicles."

The ruling in <u>Black</u>, however, cannot bear the weight that Singh would put upon it here.  In that case, the defendant/cross-defendant, Marlynne Young, had rented a vehicle from a car dealership while her own car was being serviced by the dealer.  In an effort to defeat the dealership's cross-claim against her for indemnification, Young argued that the statutory phrase "engaged in the business of leasing motor vehicles" should be "construed as being limited to those who are members of the car and truck rental industry."  <u>Black</u>, 608 N.W.2d at 93.  The court declined to do so, reasoning that "the language of the statute is clear," and that neither this language nor the provision's legislative history indicated that "the Legislature intended to restrict the application of [the statutory provision] to such car rental companies as Ryder, Enterprise, and U-Haul."  608 N.W.2d at 93.  In any event, the court observed that the dealership from which Young had rented

22

the vehicle would readily qualify "as a member of the 'car and truck rental industry,'"
where the contract between Young and the dealership was "printed on letterhead reading
'Joe Panian Rental Cars' and [wa]s entitled 'Rental Vehicle Agreement.'"  608 N.W.2d at
93.

Contrary to Singh's contention, the decision in Black cannot plausibly be read as
construing the statutory phrase "engaged in the business of leasing motor vehicles" to
extend to *anyone* who leases even a *single* motor vehicle.  While the court declined to
limit the reach of this statutory provision to firms whose core business is car or truck
rental, see Black, 608 N.W.2d at 93; see also Ball v. Chrysler Corp., 225 Mich. App. 284,
570 N.W.2d 481, 483 (1997) (observing that "[n]othing in the statute requires that the
lessor's primary business be retail leasing"), nothing in that decision (or any other of
which this Court is aware) suggests that a single lease alone is enough to qualify the
lessor as "engaged in the business of leasing motor vehicles."  Indeed, such a construction
would render the language at issue superfluous, as the statute requires *both* (i) a "lease
providing for the use of the motor vehicle by the lessee," *and* (ii) that the lessor be a
"person engaged in the business of leasing motor vehicles."  Mich. Comp. Laws §
257.401(2).  It readily follows, then, that the mere existence of a lease, by itself, is not
sufficient to establish both prongs of the statute, because this would reduce the latter
condition to a nullity.  No matter how broadly Black might have read this statutory
language, it did not (and could not) read out of existence the express requirement that a
lessor must be "engaged in the business of leasing motor vehicles" in order to enjoy the

23

immunity conferred by the statute.

This reading of the statute is confirmed by the Michigan Supreme Court's ruling in Gibbons v. Caraway, 455 Mich. 314, 565 N.W.2d 663 (1997) — a decision which, unfortunately, neither party brought to the Court's attention. In that case, the vehicle owner, Elmer Simko, had leased his vehicle to a business he owned, Mound Steel & Supplies, and this car then was involved in an accident while being driven by Simko's daughter, who was herself an employee of Mound Steel & Supplies. Simko, like Defendant Singh here, claimed that he was exempt from liability under § 257.401(2), but the Court rejected this contention, holding that Simko was not "engaged in the business of leasing motor vehicles." While the Court declined to "set forth a definitive and all-encompassing standard by which to determine what constitutes being engaged in the business of leasing motor vehicles," it nonetheless concluded that "an individual owner of a business who leases three cars to that business over a period of seventeen years is not engaged in the business of leasing motor vehicles." Gibbons, 565 N.W.2d at 668 (footnote omitted).

Thus, under a plain reading of the statute, and as confirmed by the Michigan Supreme Court in Gibbons, an individual who leases a single vehicle on a single occasion is not thereby transformed into a "person engaged in the business of leasing motor vehicles." Yet, apart from citing the "Owner Operator Agreement" he entered into with Buffalo Group, Defendant Singh has not identified any other record support for the proposition that he is "engaged in the business of leasing motor vehicles." Because he

24

has not satisfied this statutory prerequisite, Defendant Singh is not entitled to the

immunity conferred by Mich. Comp. Laws § 257.401(2).[6]

---

[6]In light of this conclusion, the Court need not reach Plaintiff's additional arguments against the application of this statute here.

## IV.  **CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' July 21, 2005

motion for summary judgment is DENIED.  IT IS FURTHER ORDERED that Defendant

Bhupinder Singh's July 20, 2005 motion for summary judgment also is DENIED.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  December 27, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on December 27, 2006, by electronic and/or ordinary mail.

s/Kendra Byrd
Case Manager

26